**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-2070**

---

IZUCHUKWU OZURUMBA,

Petitioner,

v.

PAMELA JO BONDI, Attorney General,

Respondent.

------------------------------

AMERICAN IMMIGRATION LAWYERS ASSOCIATION; INTERNATIONAL HUMAN RIGHTS AND REFUGEE LAW EXPERTS,

Amici Supporting Petitioner.

---

On Petition for Review of an Order of the Board of Immigration Appeals.

---

Argued: May 7, 2025 Decided: September 2, 2025

---

Before WYNN, RICHARDSON, and BERNER, Circuit Judges.

---

Petition for review granted; vacated and remanded by published opinion. Judge Wynn wrote the majority opinion, in which Judge Berner joined. Judge Richardson wrote a dissenting opinion.

---

**ARGUED:** Christopher M. Kimmel, COVINGTON & BURLING, LLP, Washington, D.C., for Petitioner. Paul F. Stone, UNITED STATES DEPARTMENT OF JUSTICE,

Washington, D.C., for Respondent. **ON BRIEF:** Aimee Mayer-Salins, Ellyn Jameson, Washington, D.C., Genesis Aguirre Guerra, AMICA CENTER FOR IMMIGRANT RIGHTS, Baltimore, Maryland; Aditya Trivedi, Sarah Kratt, COVINGTON & BURLING LLP, Washington, D.C., for Petitioner. Yaakov M. Roth, Acting Assistant Attorney General, Civil Division, Ethan B. Kanter, Chief, National Security Unit, Office of Immigration Litigation – GLA, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Jonathan Weinberg, WAYNE STATE UNIVERSITY LAW SCHOOL, Detroit, Michigan, for Amicus American Immigration Lawyers Association. Sarah H. Paoletti, Transnational Legal Clinic, UNIVERSITY OF PENNSYLVANIA LAW SCHOOL, Philadelphia, Pennsylvania, for Amici International Human Rights and Refugee Law Experts.

WYNN, Circuit Judge:

Under U.S. immigration law, a noncitizen is ineligible for asylum or withholding of removal if they have provided material support to a terrorist organization, even if they are otherwise eligible.

An immigration judge ("IJ") found that Petitioner Izuchukwu Ozurumba, a Nigerian citizen, provided material support to a terrorist organization when he was forced to prepare meals for its leaders, and denied his application for asylum or withholding of removal. The Board of Immigration Appeals ("Board") affirmed.

Because the record does not support the conclusion that Ozurumba provided material support, we grant the petition for review, vacate the Board's order, and remand to the Board for further proceedings.[1]

[1] Our good colleague apparently enjoys bombast for law—wielding rhetorical flourishes about Napoleon's alleged digestive wisdom. But it is one thing to observe that soldiers need food; it is quite another to stretch that battlefield maxim into a statutory command Congress never enacted. The statute prohibits "material support" to terrorist organizations, yes—but it does so in the particular ways that Congress enumerated. The dissent, unfazed by textual restraint, wants to read "meals" into the statute as though judges have the freedom of grocery clerks who can stock the shelves of statutes as they see fit.

But Congress chose specific terms; judges are not free to supplement them because Frederick the Great talked about his dinner. To say that every provision of food is support for terrorism is to collapse the statute into absurdity: under the dissent's theory, a soup kitchen feeding the hungry—some of whom may be unsavory characters—would find itself guilty of aiding terrorism. That's not textual fidelity; that is judicial overreach.

Nonetheless, the dissent accuses the majority of policymaking. The irony is rich. What the dissent proposes is not interpretation of law but enactment of a new one—that makes for a stirring read but it's not what Congress wrote.

# I.

## A.

The following facts are drawn from Ozurumba's testimony, which the IJ found "generally credible . . . . [and] consistent," J.A. 193;[2] the testimony of Ozurumba's country-conditions expert, Dr. Inge Amundsen, which the IJ found "credible and helpful," J.A. 194; and Ozurumba's declaration in support of his application for asylum and withholding of removal. The Board did not disturb the IJ's credibility determinations.

Ozurumba is a 56-year-old native and citizen of Nigeria. In 2005, he traveled to Venezuela in search of more lucrative employment. He obtained a residential visa and remained in Venezuela for five years, working in clothing sales. Ultimately, however, after being robbed several times and in light of what he described as Venezuela's "turmoil," Ozurumba moved back to Nigeria in 2010. J.A. 526. He continued to work in clothing sales, but struggled to make ends meet. By 2022, Ozurumba was "desperate for a better job," and began asking "everyone [he] knew" for leads. J.A. 527. An acquaintance, Peter, told him about an opportunity to work as a cook at Peter's workplace. Peter did not answer Ozurumba's questions about the nature of his employer; he simply directed him to a bus station.

Ozurumba travelled to the bus station, boarded a van along with several other people, and was driven about 45 minutes "to a rural camp, where there were a couple of

[2] Citations to the "J.A." refer to the Joint Appendix filed under seal by the parties in this appeal.

houses and a warehouse" and security officers who "patrolled and carried guns." J.A. 527. The camp looked to Ozurumba "like a factory" or "a company." J.A. 308. A man Ozurumba understood to be "the boss" told him that if the leaders of the camp liked his cooking, they would employ him. J.A. 311. The leaders did like his cooking, and they hired Ozurumba to cook three meals a day for the 15 to 17 "bosses" of the camp. J.A. 318.

Only after starting work did Ozurumba begin to discover the true purpose of the camp. Ozurumba testified that as soon as he arrived, "[t]here was no way for [him] to leave" because security forces guarded the gates. J.A. 320. He soon "observed people that were in government and politicians" entering and leaving the camp, including the governor of Imo State, who Ozurumba had heard was "not a good person." J.A. 312. He asked Peter what purpose the camp served and why politicians were visiting. Peter initially "refused to respond" to Ozurumba's questions, but eventually told him that the camp's leaders "used the young boys in that place to commit evil, destroy things like the police stations," and extort government officials. J.A. 313–14. Ozurumba soon learned that the camp belonged to a group known as the "Unknown Gunmen."

Ozurumba's country-conditions expert, Dr. Amundsen, testified that the Unknown Gunmen are likely Igbo separatists who operate in the Biafra region in southern Nigeria. Dr. Amundsen credited several reports showing that two Igbo separatist groups—the Indigenous People of Biafra and the Eastern Security Network—operate camps in the area that Ozurumba described. Some local politicians support these groups, but the Nigerian government considers them to be terrorist organizations. Dr. Amundsen explained that politicians sometimes hire Unknown Gunmen to intimidate voters during elections, and

Ozurumba cited reports of Unknown Gunmen burning down police stations and killing politicians. Dr. Amundsen noted that some workers in Unknown Gunmen camps are there voluntarily to earn money or to support the cause, but that others were "abducted or forced into it." J.A. 445. He testified, as did Ozurumba, that the police cannot protect people from the Unknown Gunmen.

Following his conversation with Peter, Ozurumba noticed that, after young people would leave and return to camp, he would see news reports of murder or arson. He concluded that those crimes were committed by the Unknown Gunmen. Because he opposes violence, Ozurumba "became very, very upset" and withdrew from the camp's social life. J.A. 314.

The "second in command" at the camp noticed that Ozurumba's attitude had changed. J.A. 326. He "use[d] a hard voice" with Ozurumba and told others to "monitor" him. J.A. 330. On one occasion, Ozurumba was asked to accompany a group of Unknown Gunmen on what he expected would be a violent raid; he feigned illness and did not participate in the raid. He later saw on the news that a politician's house and cars had been burned.

Around this time, the camp's leaders stopped paying Ozurumba for his work, and Ozurumba became afraid for his life. He told one of the leaders that he wanted to quit, but was told that he must keep working. The security guards wouldn't allow him to leave, so Ozurumba continued working without pay "until [he] had an escape plan." J.A. 528.

After around six months of cooking for the camp's leaders—three without pay—Ozurumba seized an opportunity to escape. The camp sent Ozurumba into town to buy

groceries, escorted by someone else from the camp. When they stopped for gas, Ozurumba got permission to use the restroom. He escaped through an open gate into the bush, where he stayed for two days before making his way to a nearby city. From there he went to Lagos, where he stayed with a friend for two days. When the friend "became fearful," Ozurumba "started to move from house to house." J.A. 333. Members of the Unknown Gunmen called him "every day" to tell him that they would find him and "do something very bad to" him because he "had discovered what they were doing." J.A. 333–34.

One day in Lagos, as Ozurumba left a church service, he noticed a car following him. "[T]he next thing [he] knew, four people jumped [out of] the car." J.A. 334. They called his name, beat him with sticks and knives, and threatened to kill him if he did not go with them. Bystanders called the police, but Ozurumba does not know whether they reported to the scene because he passed out. He regained consciousness in a hospital, and staff informed him that he had been brought there by somebody who was not a police officer. Ozurumba suffered injuries to his head and leg.

On another occasion, Unknown Gunmen showed up at the door of a house in Lagos where Ozurumba was staying. Ozurumba screamed for the neighbors, and the Gunmen fled in a car. Yet another time, Unknown Gunmen followed Ozurumba on the way home from the store, threatening to kill him. He screamed again, drawing a crowd, and the Unknown Gunmen ran away. After this incident, Ozurumba felt that "if [he] stay[ed] [in Nigeria,] [he] [would] not be able to live." J.A. 338. He asked his brother to sell their deceased father's land to raise funds for him to leave the country.

Ozurumba used the money to travel back to Venezuela, where he had last lived in 2010. But he "felt unsafe and knew [he] could not survive there." J.A. 529. At the same time, he could not go home: Unknown Gunmen called him frequently to tell him that the day he returned to Nigeria "would be the day that [he] would die." J.A. 341.

After five months in Venezuela, Ozurumba raised enough money to travel to the United States. He entered at the southern border in July 2023, where he surrendered himself to Border Patrol. He passed a credible-fear interview and rebutted the presumption of ineligibility for asylum under the Circumvention of Lawful Pathways rule. *See* 8 C.F.R. § 1208.33. On August 22, 2023, the Department of Homeland Security issued Ozurumba a notice to appear in removal proceedings. Ozurumba was detained by Immigration and Customs Enforcement throughout the proceedings that followed.

B.

In his first immigration hearing, Ozurumba admitted that he was a native and citizen of Nigeria and that he had entered the United States without valid entry documents. The IJ found him removable as charged but gave him an opportunity to apply for asylum and withholding of removal, and for protection under the Convention Against Torture. Ozurumba did so, and the IJ held merits hearings on his application in February and March 2024. In an oral decision issued on March 7, 2024, the IJ denied Ozurumba all forms of relief and ordered him removed to Nigeria.

Two elements of that decision, as later addressed by the Board, are relevant on appeal. First, the IJ found Ozurumba ineligible for asylum and withholding of removal based on a provision of the Immigration and Nationality Act known as the material-support

bar, which deems inadmissible a noncitizen who "affords material support" to a "terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI); *see id.* § 1182(a)(3)(B)(i)(I). The IJ concluded that the Unknown Gunmen qualify as a terrorist organization and that Ozurumba lent material support to the group by "providing food, in the form of cooking" for "the bosses of the camp three times a day for anywhere from three to six months." J.A. 197. Second, the IJ found Ozurumba ineligible for deferral of removal under the CAT and its implementing regulations because he failed to show that he would likely be tortured with the acquiescence of a public official if removed to Nigeria. *See* 8 C.F.R. §§ 208.16(c), 208.18(a)(1).

On September 27, 2024, the Board affirmed. It agreed with the IJ that the material-support bar has no de minimis or duress exceptions, such that even "relatively minimal" actions are sufficient to bar asylum and withholding of removal. J.A. 4. The Board also affirmed the IJ's denial of deferral of removal under the CAT, explaining that Ozurumba "has not shown a clear probability that members of the Unknown Gunmen will torture him in the future, or that any harm to him would be inflicted by or with the consent or acquiescence (including 'willful blindness') of a public official or other person acting in an official capacity." J.A. 5.

Ozurumba timely petitioned this Court for review. In December 2024, Ozurumba filed an emergency motion to stay the order of removal pending appeal. This Court denied the motion a few weeks later. According to his attorneys, Ozurumba was removed to Nigeria on April 1, 2025.

II.

We have jurisdiction to review the Board's final order of removal under 8 U.S.C. § 1252(a).[3] We review the Board's "factual findings for substantial evidence, treating them as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (en banc) (quoting *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014)). "We review the [Board]'s legal conclusions, including the question of whether the [Board] has applied the proper standard of review, de novo." *Ibarra Chevez v. Garland*, 31 F.4th 279, 288 (4th Cir. 2022). We will uphold the Board's decision unless we conclude that it abused its discretion—for example, "if it failed to offer a reasoned explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim." *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972 (4th Cir. 2019) (quoting *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011)).

Although it did not expressly adopt the IJ's analysis, the Board plainly incorporated elements of that analysis into "an opinion of its own" that "affirm[ed] the IJ's decision." *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018); *see* J.A. 4 ("affirm[ing]," "agree[ing] with," and citing the IJ's analysis). We cannot evaluate the Board's reasoning without reference to the IJ's analysis; accordingly, "we review both decisions." *Salgado-Sosa*, 882 F.3d at 456; *see Barahona v. Holder*, 691 F.3d 349, 353 (4th Cir. 2012) ("Where, as here, the [Board] has adopted and supplemented the IJ's decision, we review both

---

[3] The IJ's oral decision culminated in an order of removal, *see* J.A. 239, which became final (and thus appealable under 8 U.S.C. § 1252(a)) when the Board affirmed that order, *see* 8 U.S.C. § 1101(a)(47)(B)(i).

rulings."). However, because "generally we may only affirm on the grounds relied upon by the Board," *Herrera-Martinez v. Garland*, 22 F.4th 173, 180 n.1 (4th Cir. 2022) (quoting *Yanez-Marquez v. Lynch*, 789 F.3d 434, 461 n.14 (4th Cir. 2015)), we consider only those portions of the IJ's decision that have been incorporated, expressly or by reference, into the Board's decision, *Arita-Deras v. Wilkinson*, 990 F.3d 350, 356 (4th Cir. 2021).

III.

The Immigration and Nationality Act's material-support bar deems inadmissible a noncitizen who "has engaged in a terrorist activity," including by "commit[ing] an act that the [noncitizen] knows, or reasonably should know, affords material support . . . to a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(i)(I), (iv)(VI). The statute does not define "material support," although it provides some examples. *Id.* § 1182(a)(3)(B)(iv)(VI).

Noncitizens subject to the material-support bar are ineligible for asylum unless the Attorney General, in his or her discretion, makes an exception. *Id.* § 1158(b)(2)(A)(v). And "[b]ecause the burden of proof for withholding of removal is higher than for asylum—even though the facts that must be proved are the same—an applicant who is ineligible for asylum is necessarily ineligible for withholding of removal under [8 U.S.C.] § 1231(b)(3)." *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004). However, noncitizens subject to the material-support bar remain eligible for *deferral* of removal under the CAT. *Kouyate v. Garland*, 122 F.4th 132, 141 (4th Cir. 2024), *cert. denied*, No. 24-6792, 2025 WL 1426729 (U.S. May 19, 2025).

Ozurumba does not challenge the IJ's conclusion that the Unknown Gunmen qualify as a Tier III terrorist organization under 8 U.S.C. § 1182(a)(3)(B)(vi)(III).[4] Instead, he argues that the material-support bar does not apply because any support he lent the group was not "material." We agree.

We have not expressly defined the minimum support necessary to qualify as "material support" in the context of the material-support bar. In *Viegas v. Holder*, we rejected a challenge to the Board's determination that an individual's payment of monthly dues to a terrorist organization for four years qualified as "material support." 699 F.3d 798, 803 (4th Cir. 2012). We agreed with the Board that "the sum of Viegas's dues was sufficiently substantial standing alone to have some effect on the ability of the [terrorist organization] to accomplish its goals," and held that it was not arbitrary and capricious for the Board to find that support meeting that description qualified as material support. *Id.* (quotation marks omitted). But we stopped short of identifying the term's lower boundary.

As an initial matter, we note that Congress's inclusion of the modifier *material* "suggests that some support may not rise to the level that would disqualify [a noncitizen]"—in other words, some forms of support are immaterial. *Hosseini v. Nielsen*,

---

[4] A noncitizen who provides material support to a Tier I or Tier II terrorist organization is inadmissible whether or not he knew that he was supporting a terrorist organization. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc). But a noncitizen who provides material support to a Tier III terrorist organization remains admissible if he "can demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization." *Id.* § 1182(a)(3)(B)(iv)(VI)(dd); *see Hosseini v. Nielsen*, 911 F.3d 366, 373 (6th Cir. 2018). Ozurumba testified that he did not know that his employer was a terrorist organization until several weeks after starting his job as a cook and that he was unable to leave the camp. The government does not challenge that testimony.

911 F.3d 366, 375 (6th Cir. 2018). A contrary conclusion would violate "the 'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Williams v. Taylor,* 529 U.S. 362, 404 (2000)).

Because the statute does not define "material," we turn to dictionaries. As other courts of appeals have observed, two definitions of the word "material" are pertinent in this context. Black's Law Dictionary "compares material to 'relevant,' explaining that material means 'having some logical connection with the consequential facts.'" *Hosseini*, 911 F.3d at 375 (quoting *Material*, *Black's Law Dictionary* (10th ed. 2014)). "But material may also mean 'significant' or 'essential.'" *Id.* (quoting *Material*, *Black's Law Dictionary* (10th ed. 2014)); *see Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298 (3d Cir. 2004); *Merriam-Webster's Collegiate Dictionary* 717 (10th ed. 1993) ("[H]aving real importance or great consequences.").

Statutory context confirms that "material" takes both overlapping meanings here. We interpret a general term "'in light of any common attribute[s] shared by' statutory examples of that term." *Env't Prot. Agency v. Calumet Shreveport Refin., L.L.C.*, 145 S. Ct. 1735, 1746 (2025) (some quotation marks omitted) (quoting *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022)).

Here, the statute offers a list of examples of material support, including: "a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). Every

item on that list "can either be directly used to plan or carry out terrorist activities or can be readily diverted to such use." Opening Br. at 25. Indeed, the "examples suggest that the support must be 'significant' or even 'essential' to the commission of terrorism." *Hosseini*, 911 F.3d at 375–76; *see also Nuure v. Garland*, 857 F. App'x 394, 397 (9th Cir. 2021) (Friedland, J., concurring) (explaining that "unlike cooking," each of the activities enumerated in the statute are "important to advancing the goals of terrorism"). That suggests that "material support" must be both relevant (logically related to terrorism) and significant (enough to make a difference).[5]

Our colleague in dissent argues that material support need not "advance the organization's commission of terrorism." Dis. Op. at 26. That view is hard to square with this enumerated list of activities. "Perhaps," the dissent ventures, "the statute enumerates safe houses"—not because safe houses, like funds or weapons or the other items on the list, can be used to conduct terrorist activities—but because "shelter for an organization's members is important."[6] *Id.* at 31. Furthermore, the dissent continues, a "safe house never used for committing terrorism would still help the organization accomplish its goals

---

[5] We stress that "relevance" and "significance" overlap, and thus do not lend themselves to a two-part test.

[6] Even disregarding the other items on the list, were Congress actually concerned with the literal shelter of members of a terrorist organization, it could have said something like "housing." A "safe house," on the other hand, surely connotes criminal activity in this context. *See Safe House*, *Black's Law Dictionary* (8th ed. 2004) (noting that "[l]awbreakers" use safe houses "to shield criminal activity," but that safe houses could be used legally by "[l]aw enforcement agencies" to "protect witnesses").

because it provides members a place to regroup, to meet to conduct general operations, or to keep as one of many options for future activities." *Id.*

Respectfully, this argument fails to recognize the pattern between the enumerated activities, which are all susceptible to use for terrorism. To be sure, a safe house could be used for any number of non-terrorist purposes. Our reading is not that every item on the list could *only* be used for terrorism, but rather that every item on the list—safe houses included—could be readily diverted for use in terrorism. That pattern helps illustrate what sorts of support Congress was concerned with, and, by implication, the sorts of support Congress was *not* concerned with.

Our reading is consistent with the Supreme Court's interpretation of "material support" in a similar statute in *Holder v. Humanitarian Law Project* (*HLP*), 561 U.S. 1 (2010). There, the Supreme Court interpreted the criminal material-support provision in 18 U.S.C. § 2339B as prohibiting, among other things, "train[ing] members of [the terrorist organization] on how to use humanitarian and international law to peacefully resolve disputes" and "how to petition various representative bodies such as the United Nations for relief"—which, the Court was careful to note, "naturally included monetary relief." *Id.* at 36–37. "Money is fungible," the Court explained, "and Congress logically concluded that money a terrorist group . . . obtains using the techniques plaintiffs propose to teach could be redirected to funding the group's violent activities." *Id.* at 37. "Such support . . . . also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which

facilitate more terrorist attacks." *Id.* at 30. In other words, the Court held that support was material insofar as it helps the organization carry out its terrorist activities.

The government argues that *material* refers to "a type of support rather than an amount or quantity." Response Br. at 21. We agree with the premise: the measure of material support is more qualitative than quantitative.

But the government makes no persuasive attempt to identify what type of support is material. The closest it comes is to cite the Board's definition from its 2018 decision in *In re A-C-M-*, which encompasses any support that has a "logical and reasonably foreseeable tendency to promote, sustain, or maintain the organization, even if only to a de minimis degree." Response Br. at 20 (quoting *In re A-C-M-*, 27 I. & N. Dec. 303, 308 (BIA 2018)). That interpretation does not bind us, nor are we permitted to defer to the Board's reasoning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).

Moreover, *A-C-M-*'s interpretation reads the word "material" out of the statute. Support that meets *A-C-M-*'s criteria need not be relevant or significant to terrorist activities. The government admits as much when it argues that "material support . . . is a term of art designed to cut off *all* support to terrorist organizations." Response Br. at 32. Tellingly, the government fails to identify a single example of *immaterial* support. Under its interpretation, it seems, no such thing exists.

We decline to read the material-support bar so broadly. Instead, we adopt the definition we gestured toward in *Viegas*: "material support" is support that is sufficiently substantial standing alone to help the terrorist organization accomplish its terrorist activities. *Cf. Viegas*, 699 F.3d at 803.

Ozurumba's contributions to the Unknown Gunmen do not meet that standard. Cooking meals using food and supplies purchased by the organization may have "sustained" the organization in the broadest possible sense—by converting raw groceries into meals they enjoyed—but provided nothing that the organization could use or readily divert to plan or carry out its terrorist activities. As far as the record shows, Ozurumba was simply a captive laborer whose work had nothing to do with those activities.

Nor did Ozurumba's brief association with the group—which appears to have been the result of a bait-and-switch—"lend legitimacy" to the group. *HLP*, 561 U.S. at 30. In *Hosseini v. Nielsen*, the Sixth Circuit, citing *HLP*, concluded that the material-support bar applied to an individual who copied and distributed flyers for two terrorist groups because that action introduced others to the terrorist organizations, "allowed th[e] organizations to redirect some of their communications resources elsewhere," and "gave [them] legitimacy."[7] 911 F.3d at 377. By contrast, Ozurumba's cooking demonstrated no expressive affinity for the Unknown Gunmen, and neither publicized nor legitimized their activities.

In sum, we conclude that Ozurumba's cooking was not sufficiently substantial standing alone to help the Unknown Gunmen accomplish their terrorist activities. On this record, the Board erred in applying the material-support bar to deny Ozurumba's

[7] Similarly, in *Viegas*, we affirmed the Board's application of the material-support bar to a noncitizen who "hung posters for" a terrorist organization, although our holding relied on that noncitizen's four years of "voluntarily paid dues," which were "sufficiently substantial standing alone to have some effect on the ability of the [terrorist organization] to accomplish its goals." 699 F.3d at 803 (quotation marks omitted).

application for asylum and withholding of removal. We therefore vacate the order of removal and remand for further proceedings.[8]

IV.

Ozurumba argues in the alternative that any material support he provided to the Unknown Gunmen was under duress, and that the material-support bar includes an implied exception for material support provided under duress. This raises an unanswered question of administrative law that we will leave for a future case.

In *Barahona v. Holder*, we "defer[red]" under *Chevron* to the Board's determination that the material-support bar has no implied duress exception. 691 F.3d at 356 (4th. Cir. 2012). In other words, we held that the statute was ambiguous as to whether it included a duress exception but that the Board reasonably concluded that it didn't. But in *Loper Bright Enterprises v. Raimondo*, the Supreme Court held that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous." 603 U.S. at 413 (2024). At first blush, then, it's not clear that *Barahona*'s holding—which was based on *Chevron* deference—retains precedential value.

---

[8] Ozurumba also argues that the Board erred in denying his application for deferral of removal under the CAT. As a matter of judicial economy, we decline to reach that claim. *See Immigr. & Naturalization Serv. v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach."); *Arita-Deras*, 990 F.3d at 361 n.10 (declining to reach withholding-of-removal and CAT claims in light of vacatur and remand on asylum claim). If the Board were to decide on remand to reverse the IJ's denial of asylum or withholding of removal, there would be no need for the Board or this Court to address Ozurumba's CAT arguments. And in light of our vacatur, the Board could decide to remand to the IJ for further proceedings on the CAT issue. Accordingly, we express no view on the merits of the CAT claim.

However, *Loper Bright* held, "we do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful—including the Clean Air Act holding of *Chevron* itself—are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Id.* at 412. We reaffirmed that approach in *Chavez v. Bondi*, 134 F.4th 207, 213 (4th Cir. 2025).

The government contends *Loper Bright* "made clear that just because a prior decision was based on *Chevron* is insufficient to undermine its precedential value," so "*Barahona*'s holding that there is no implied duress exception to the [material-support] bar remains intact." Response Br. at 46, 48 (capitalization normalized). We aren't so sure. *Loper Bright* binds us to our "holdings . . . that *specific agency actions are lawful*." 603 U.S. at 412 (emphasis added). In *Barahona*, the specific agency action was "deeming [Barahona] ineligible for . . . relief." 691 F.3d at 350. So, while Barahona may not reopen his case simply because *Chevron* is dead, it's not clear that Ozurumba is precluded from making a duress argument. On the other hand, *Loper Bright* instructs us to apply "*statutory*" stare decisis, which might indicate that our statutory interpretation is still binding. 603 U.S. at 412 (emphasis added).

*Loper Bright* is not crystal clear on how to square this circle, and circuits have already split on how to treat *Chevron* holdings. *Compare In re MCP No. 185*, 124 F.4th 993, 1002 (6th Cir. 2025) (holding that "we are not bound" by a *Chevron* statutory interpretation because that case approved of a different "specific agency action" than the one before the Sixth Circuit), *with Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024)

(holding that the statutory interpretation in a *Chevron* case "remains precedential authority which binds us").

The government's approach to stare decisis also presents a practical problem. Prior to *Loper Bright*, agencies were, within certain bounds, permitted to change their interpretations of a statute. Under the government's view, we would be stuck—forever—with the most recent agency interpretation that we upheld before *Loper Bright*. That strikes us as arbitrary.

Because we hold that any support Ozurumba provided the Unknown Gunmen was not "material," we leave these questions for a more appropriate case, where parties can better brief and argue this important question of administrative law.

V.

Ozurumba's attorneys represent that on April 1, 2025, the government removed him to Nigeria. Shortly after his deportation, Ozurumba requested that we order the government to facilitate his return to the United States. We decline to do so at this stage, instead leaving the matter for the agency to address in the first instance.

As we explained in our 2018 decision in *Ramirez v. Sessions*, "[u]nder an Immigration and Customs Enforcement (ICE) policy directive, '[a]bsent extraordinary circumstances, if [a noncitizen] who prevails before . . . a U.S. court of appeals was removed while his or her [petition for review] was pending, ICE will facilitate the [noncitizen's] return to the United States if . . . the [noncitizen's] presence is necessary for

continued administrative removal proceedings.'"[9] 887 F.3d 693, 706 (4th Cir. 2018) (citation omitted) (quoting U.S. Immigr. and Customs Enf't, Policy Directive Number 11061.1, *Facilitating the Return to the United States of Certain Lawfully Removed Aliens* (Feb. 24, 2012), https://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_return.pdf [https://perma.cc/24UQ-F5W8]). We leave it to the agency on remand to decide whether Ozurumba's presence will be necessary to his continued removal proceedings.

VI.

We grant Ozurumba's petition for review, vacate the Board's order of removal, and remand for further proceedings.

*PETITION GRANTED; ORDER OF REMOVAL VACATED, AND REMANDED*

---

[9] As we explained in *Ramirez*, in this context, "facilitating [a noncitizen's] return" includes "enabling [them] to 'engage in activities which allow [them] to travel to the United States (such as by issuing a Boarding Letter to permit commercial air travel) and, if warranted, parol[ing] [them] into the United States upon . . . arrival at a U.S. port of entry.'" 887 F.3d at 706 n.11 (quoting Directive 11061.1). It "does not necessarily include funding the [noncitizen's] travel via commercial carrier to the United States or making flight arrangements for the [noncitizen]." *Id.* (quoting Directive 11061.1).

RICHARDSON, Circuit Judge, dissenting:

"An army marches on its stomach." This truism is widely attributed to Napoleon Bonaparte, the famous French commander and emperor, and to Frederick the Great, the well-known King of Prussia. Perplexingly, the majority thinks it knows better, finding that providing thousands of meals to a terrorist organization does not constitute material support to that organization. It arrives at this answer by reading one of the several objects of material support—terrorist organization—out of the statute, narrowing it to only include support for acts of terrorism. Because I cannot go along with such judicial policy-making, or with the majority's other errors, I respectfully dissent.

## I. Background

Izuchukwu Ozurumba admits that he cooked around 8,000 meals[1] for the bosses of the Unknown Gunmen, a Nigerian organization that he knew committed acts of terrorism. Ozurumba, however, eventually fled Nigeria to Venezuela. He later crossed the southern border into the United States in July 2023.

When Ozurumba arrived in the United States, he was detained by Border Patrol personnel and ordered to appear for removal proceedings. At the removal proceedings, the Immigration Judge determined that the Unknown Gunmen were a Tier III terrorist organization.[2] The Immigration Judge then found that Ozurumba had materially supported

[1] Ozurumba testified that he cooked meals for the 15–17 leaders of the camp, three times a day, seven days a week, for six months.

[2] Terrorist organizations are separated into three tiers. 8 U.S.C. § 1182(a)(3)(B)(vi). Tier I and II organizations must be designated as such by certain members of the executive

the Unknown Gunmen and thus barred him from receiving asylum or withholding of removal under the Convention Against Torture. *See* 8 U.S.C. §§ 1182(a)(3)(B)(i), (iv). The Board of Immigration Appeals affirmed the Immigration Judge's application of the material-support bar. Ozurumba timely petitioned for review.

## II. Material Support To A Terrorist Organization Means Support Which Helps A Terrorist Organization Achieve Its Goals

Section 1182(a)(3)(B)(i) provides that "[a]ny alien who . . . has engaged in a terrorist activity . . . is inadmissible." Nobody contends, however, that Ozurumba "hijack[ed] . . . an aircraft" or "attack[ed] . . . an internationally protected person." *See* § 1182(a)(3)(B)(iii) (defining "[t]errorist activity"). He is not a terrorist in that sense.

But an alien may "engage in terrorist activity" in ways other than committing acts of terrorism. § 1182(a)(3)(B)(iv). Instead, the statute broadly defines "engage in terrorist activity" to include any "act that the actor knows, or reasonably should know, affords material support . . . for the commission of a terrorist activity." § 1182(a)(3)(B)(iv)(VI)(aa). Importantly, its broad definition *also* includes any "act that

---

branch. §§ 1182(a)(3)(B)(vi)(I)–(II), 1189(a). Tier III organizations are "group[s] of two or more individuals . . . which engage[] in" terrorist activities as defined by § 1182(a)(3)(B)(iv). § 1182(a)(3)(B)(vi)(III). Immigration Judges and the Board designate organizations as Tier III terrorist organizations "on a case-by-case basis . . . ., and [a]s a result," such a designation "only impacts the alien whose case is before that" Immigration Judge or the Board. *A.A. v. Att'y Gen. U.S.*, 973 F.3d 171, 178–79 (3d Cir. 2020).

Here, Ozurumba's Immigration Judge determined that the Unknown Gunmen were a Tier III terrorist organization. The Board held that Ozurumba waived any challenge to that determination. He does not appeal that decision, so I join the majority in accepting it. Majority Op. at 12.

the actor knows, or reasonably should know, affords *material support* . . . to a *terrorist organization*." § 1182(a)(3)(B)(iv)(VI)(dd) (emphasis added). It is whether Ozurumba provided "material support . . . to a terrorist organization" that we must answer.[3]

The phrase "material support to a terrorist organization" is not self-defining. But our traditional tools of interpretation reveal its meaning. Start with the noun "support." "Support" is broadly defined as many things, including "a source or means of living," "sustenance," etc. *Support*, *Black's Law Dictionary* (6th ed. 1990); *accord Support*, *Black's Law Dictionary* (7th ed. 1999).[4] By definition, "support" plainly includes food, which is "sustenance."[5]

Next, the adjective "material." "Material" might have two senses—one quantitative, and one qualitative. In the first, "material" might mean that the support is "significant." *Material*, *Black's Law Dictionary* (7th ed. 1999); *see also Material*, *Black's*

---

[3] We must answer that question, as that's what the agency found barred Ozurumba's admission. *See Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

[4] The material-support bar was added in 1990. Bryan Clark & William Holahan, *Material Support: Immigration and National Security*, 59 Cath. U. L. Rev. 935, 939–42 (2010). In 2001, Congress amended the language to its present form. USA PATRIOT Act, Pub. L. No. 107-56, § 411(a)(1)(F), 115 Stat. 272, 346. Thus, dictionaries from this period inform the meaning of the material-support bar.

[5] The statutory examples illustrate that "material support" extends beyond providing the tools of terror, covering areas as diverse as shelter, transportation, and communications. § 1182(a)(3)(B)(iv)(VI) ("including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training"). By use of the term "including," the statute facially extends beyond the listed examples. *See, e.g.*, *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941). Thus, terms like *safe house* and *transportation* shed light on what *material support* means "general[ly]." *Id.*

*Law Dictionary* (6th ed. 1990) (defining material as "important" or "having influence or effect."). In the second, "material" might mean relevant, or "logical[ly] connect[ed]" to the object of the noun it modifies. *See, e.g.*, *Material*, *Black's Law Dictionary* (7th ed. 1999).

Some types of support to an organization, even if quantitatively minimal, can be material merely because of their qualitative aspects, such as fungibility, legitimizing power, or aspects otherwise core to an organization's needs or goals. *See, e.g.*, *Sesay v. Att'y Gen. of U.S.*, 787 F.3d 215, 221 (3d Cir. 2015) (collecting cases). Qualitative materiality requires articulating *how* the support is connected to the organization's goals. Other types of support, standing alone, may lack qualitative significance. For example, letting one organization member walk across your property is likely not material. But sometimes quantity changes the qualitative nature of the support. If everyone in the organization crosses your land as a shortcut to their headquarters, significance and relevance emerge. By its nature, support is something helpful (even if only marginally in small quantities). It therefore follows that once there is enough of it, no matter the type, it can become material.[6] Indeed, this Court has suggested that material support encompasses these ideas. We upheld a Board determination that an alien's provision of money and services was "material support" because it was "sufficiently substantial standing alone to

[6] This does not mean that anything can be material support. If something does not constitute support to begin with, increasing it will not magically transform it into support, much less material support. For example, let's say one started dumping garbage at a terrorist organization's camp. No matter how much garbage one gives to the terrorist organization, it would not count as "material support" because dumping garbage is not "support" at all.

have some effect on the ability of the" terror organization "to accomplish its goals." *Viegas v. Holder*, 699 F.3d 798, 803 (4th Cir. 2012).

Yet "material support to a terrorist organization" does not mean such support must advance the organization's commission of terrorism. In the material-support bar itself, Congress distinguished affording material support "for the *commission of a terrorist activity*" from material support "to a *terrorist organization*." §§ 1182(a)(3)(B)(iv)(VI)(aa), (dd) (emphasis added). By enumerating both objects, Congress has instructed us that the material-support bar sweeps more broadly than support for the terroristic acts that a terrorist organization takes. Congress could have added the phrase "for a terrorist activity" as a qualifier to subclause (dd)—but it did not. Nor did it in subclause (cc), which applies to support for Tier I and Tier II terrorist organizations (while (dd) applies to Tier III organizations). § 1182(a)(3)(B)(iv)(VI)(cc). Nor did it in subclause (bb), which bars anyone who provides material support "to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity." § 1182(a)(3)(B)(iv)(VI)(bb). Congress three times, then, decided that material support extends beyond support tied to "the commission of terrorism" or the "accomplish[ment]" of "terrorist activities." *Contra* Majority Op. at 14, 16. The only possible interpretation of this statute is that a terrorist organization may be materially supported by means that lack a connection to acts of terrorism.[7]

[7] This is nontrivial. Despite their name, terrorist organizations often have goals beyond committing acts of terrorism. *HLP*, 561 U.S. at 30–31. They may have social, political, and even charitable goals. *See id.* Without financial firewalls, funds raised for admirable goals can be redirected to terroristic ones. *Id.* at 31.

The Supreme Court adopted this broad interpretation in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). In *HLP* the Supreme Court interpreted 18 U.S.C. § 2339B, a statute which criminalizes "knowingly" providing "material support or resources to" terrorist organizations. 561 U.S. at 7. Like Ozurumba and the majority, the organization in *HLP* argued that material support of a terrorist organization required "proof that a defendant intended to further a foreign terrorist organization's illegal activities"—that is, their terrorism. *HLP*, 561 U.S. at 16. The court swiftly rejected that view. In analyzing the breadth of "material support," the Court looked to surrounding statutory text. *See id.* Specifically, 18 U.S.C. § 2339A(a) criminalized "provid[ing] material support or resources . . . *knowing or intending* that they are to be used in preparation for, or in carrying out . . . violent terrorist acts." *Id.* at 17 (quoting § 2339A(a)) (cleaned up). In contrast, § 2339B(a)(1) only "prohibits '*knowingly*' providing material support" and makes no mention of specific terrorist acts. *Id.* at 16. The Court found respondent's view "untenable in light of the sections immediately surrounding § 2339B," because Congress did not import the specific intent language of § 2339A into § 2339B, when it easily could have. *Id.* In other words, the Court refused to only apply § 2339B in situations where someone specifically aided terrorist activity, because that interpretation is unsupported by the statute's language.

The majority's treatment of *HLP* is facially incorrect. It reads the Supreme Court as saying "support" is "material insofar as it helps the organization carry out its terrorist activities." Majority Op. at 16. But that view was not expressed by the Supreme Court majority—it was the view of the dissent. *See HLP*, 561 U.S. at 56 (Breyer, J., dissenting)

("I would read the statute as criminalizing" the support at issue "only when the defendant knows or intends that those activities will assist the organization's unlawful terrorist actions."). The *HLP* majority squarely rejected that view: "[T]he dissent proposes a" construction that renders § 2339B "indistinguishable from the one Congress adopted in § 2339A." *Id.* at 18 n.3. Like the dissent's view in *HLP*, the majority's view here is untenable as it renders (dd) "indistinguishable" from (aa).[8]

By the majority's account, material support *must* be "significant" or even "essential" to "the commission of terrorism." Majority Op. at 14 (quotation omitted). This interpretation is irreconcilable with the statutory text.

The majority justifies its conclusion by pointing out that "[e]very item on th[e] [enumerated] list can either be directly used to plan or carry out terrorist activities or can be readily diverted to such use." *Id.* at 13–14 (quotation omitted). That may be true in some sense. But safe houses and transportation can also support terrorist organizations'

---

[8] Ignoring *HLP*'s section discussing statutory interpretation, 561 U.S. at 16–18, the majority instead cherry-picks language from an unexpected place: the section discussing why the government's prohibition on material support in the form of speech survives First Amendment scrutiny. *Id.* at 28–29. Because the government's material-support statute burdened speech, the Court demanded a government interest to justify that burden. Everyone agreed that the "interest in combating terrorism is an urgent objective of the highest order." *Id.* Yet the *HLP* plaintiffs argued that the government prohibition still violated the First Amendment because the material-support ban was "not necessary" to further that interest. *Id.* at 28 (quotation omitted). The *HLP* Court then explained how Congress could justify banning material support in the form of speech to further *that specific interest*. *Id.* at 29–38. As this summary should make clear, the Supreme Court's language connecting the *HLP* plaintiffs' speech-based material support to furthering terrorism was applicable only to the First Amendment analysis. Nothing in *HLP* stands for the proposition that support is only "material" insofar as it helps the organization carry out its terrorist activities.

goals even if never used for, or diverted to use in, carrying out terrorist activities—and subclause (dd) tells us that would *still* be material support. Further, by artificially limiting the material-support bar's breadth, the majority's interpretation renders the enumeration of all the objects—terrorist activities, terrorists, and terrorist organizations—superfluous by ignoring all but the first. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (It is "one of the most basic interpretive canons, that a statute should be construed . . . so that no part will be inoperative.") (quotation omitted); *Espinal-Andrades v. Holder*, 777 F.3d 163, 168 (4th Cir. 2015) (same).

The majority also incorrectly suggests that interpreting the term "material support to a terrorist organization" to extend beyond support for specific terrorist activities permits any support to fall within its scope. Majority Op. at 16. But that is not the case. As I explained above, material support requires enough support to have some meaningful impact on the terrorist organization's ability to achieve its goals. For example, though food can constitute material support, selling a hot dog to a terrorist would not count. Nor would "material support to a terrorist organization" appear to include uncoordinated advocacy. It may be generally supportive of the terrorist organization, but advocacy not done in coordination with a terrorist organization would not appear to provide material support to that terrorist organization. *See HLP*, 561 U.S. at 24–26. Not all support qualifies as "material support to a terrorist organization."

While not everything qualifies, Ozurumba's actions do. Ozurumba's cooking undoubtedly constituted "support" "to a terrorist organization." The remaining question is whether Ozurumba's support was "material." Did it help the Unknown Gunmen

"accomplish its goals"? *Viegas*, 699 F.3d at 803. I would answer, yes, *providing thousands of meals* to a terrorist organization is "material support to a terrorist organization."

First, Ozurumba's support was quantitatively material.[9] Ozurumba did not run a hot dog stand that the Unknown Gunmen happened to stop by once or twice. Rather, he acted as a private chef, providing three meals a day for over a dozen leaders of a terrorist organization—for months. These many meals, to my mind, were "sufficiently substantial." *Viegas*, 699 F.3d at 803.

I find nothing but support in precedent for this conclusion. In *Viegas*, for example, this Court found that a man who "every month for four years . . . voluntarily paid dues and hung posters for" a terrorist organization provided material support. *Id.* at 803. The Court explained that while "a single exchange of a small amount of food and money" might not be material support, "the sum of" the support provided over months was meaningful. *Id.* So too here—while a single meal might not be enough to have any impact, over 8,000 of them is enough. And our sister circuits seem to agree. For example, the Second Circuit accepted that providing "$100 packages of foodstuffs every three months for more than two years" constituted material support. *Hernandez v. Sessions*, 884 F.3d 107, 109 (2d Cir. 2018).

---

[9] I note that whether materiality has quantitative aspect is a debated question. Board precedent has found no such requirement. *Matter of A-C-M-*, 27 I. & N. Dec. 303, 306 (B.I.A. 2018) ("no such quantitative limitation exists."). Though at least one of our sister circuits has found that material means both "relevant and significant." *Hosseini v. Nielson*, 911 F.3d 366, 376 (2018). While this Court has not explicitly taken a side on the issue, we intimated in *Viegas* that the amount of support matters. 699 F.3d at 803.

Second, Ozurumba's support was qualitatively material. An organization acts through its members, and its members need to eat. Food is a basic need. *Cf.* Abraham H. Maslow, *A Theory of Human Motivation*, 50 Psych. Rev. 351, 373 (1943) (famously listing food as a predicate need to the achievement of other goals). Indeed, it's quite difficult to imagine how a terrorist organization could achieve any goal without first being fed. And because of the regularity of the meals, the circumstances in which the meals were prepared and served—and, yes, the sheer quantity of the meals—Ozurumba's support took on a different quality. It amounted to completely providing for one basic physiological need of the leaders of a terrorist organization. This is material support to the organization itself. That is, providing the basics helps terrorist organizations "accomplish [their] goals." *Viegas*, 699 F.3d at 803. Perhaps that's why the statute enumerates safe houses as a classic example of material support to a terrorist organization—shelter for an organization's members is important. A safe house never used for committing terrorism would still help the organization accomplish its goals because it provides members a place to regroup, to meet to conduct general operations, or to keep as one of many options for future activities. Preparing the daily nutritional requirements of the leadership of an organization is no less important.

In addition to common sense, precedent supports this conclusion. For example, in *Barahona v. Holder*, this Court took as a given that a man who allowed a terrorist organization to "prepar[e] food in [his] kitchen" and "occasionally sleep[] overnight when the weather was unfavorable" provided material support. 691 F.3d 349, 351–52, 354–55 (4th Cir. 2012). That support was not connected to any act of terror—it was just food and

shelter more generally. *See id.* at 351–52. And several of our sister circuits have likewise upheld Board decisions that providing food and shelter, unconnected to any particular act of terrorism, constitutes material support. *See, e.g.*, *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298–301 (3d Cir. 2004); *Hernandez v. Sessions*, 884 F.3d 107, 109 (2d Cir. 2018).

Ozurumba provided thousands of meals for the leaders of the Unknown Gunmen.[10] Food is support. And the meals Ozurumba cooked provided for the leaders' basic needs, freeing up time, energy, and money for those leaders to focus on their goals. I would thus find that substantial evidence supports the Board's determination that the material-support bar applies.[11]

---

[10] There is a factual dispute about whether Ozurumba worked voluntarily. That dispute is legally irrelevant: This Court has held that there is no duress exception to the material-support bar. *See Barahona*, 691 F.3d at 354–55. And, as the majority acknowledges, that decision may remain binding even after *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). *See Chavez v. Bondi*, 134 F.4th 207, 212–13 (4th Cir. 2025) ("[P]rior cases that relied on the *Chevron* framework . . . are still subject to statutory stare decisis.") (quotation omitted). But if *Barahona* is no longer binding, then I would find—for many of the reasons discussed in *Barahona*—that a duress exception cannot be read into the statutory material-support bar. So I would reject Ozurumba's duress argument.

[11] I add one final note—Ozurumba's cooking should qualify as material support under the majority's own criteria, as preparing every meal for the leaders of a terrorist organization is "significant or even essential to the commission of terrorism." Majority Op. at 14 (quotation omitted). Contrary to the majority's assertion, sustenance is a literal prerequisite to "plan or carry out" acts of terror. *Id.* at 17. It is no less necessary, in a strict sense, than a map or weapon. Furthermore, as the Supreme Court has recognized, "providing . . . even seemingly benign support" to a terrorist organization "bolsters the terrorist activities of that organization." *HLP*, 561 U.S. at 36. That's because the provision of "valuable resource[s] . . . . frees up other resources within the organization that may be put to violent ends." *Id.* at 30. Thus not only does the majority render the wrong interpretation of the material-support bar, but it also analyzes this case incorrectly under that interpretation.

* * *

The majority takes a red pen to the material-support bar, eliminating major provisions of the statute. It does so to find that providing for the basic needs of the members of a terrorist organization does not materially support the organization. I respectfully dissent.

---

The majority attempts to sidestep this by noting that Ozurumba "provided nothing that the organization could use or readily divert to plan or carry out its terrorist activities." Majority Op. at 17. But that's not the test it laid out just three pages earlier, *see id.* at 14, nor is it one which the statute permits. And even the majority implicitly recognizes that what is essential to terrorism may not be readily divertible to carrying out terrorist activities: Such support may first lend legitimacy to the organization, which *then* makes it easier to persist, recruit, and fundraise, and *only then* facilitates more attacks. *Id.* at 15–16.